2017R00766/DVC/ETW

**RECEIVED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MAR 29 2023

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 23- 257 (KMW) AT 8:30_____M |
| | : | CLERK, U.S. DISTRICT COURT - DNJ |
| v. | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1343 |
| WILLIAM O'HANLON, | : | 18 U.S.C. § 2326 |
| a/k/a "Patrick Burns," | : | 18 U.S.C. § 2 |
| a/k/a "William Burns," | : | 26 U.S.C. § 7201 |
| KAREN STEFANOWSKI, | : | 18 U.S.C. § 641 |
| a/k/a "Karen O'Hanlon," | : | |
| JAMES TONER, | : | |
| a/k/a "Jason Turner," | : | |
| a/k/a "James Turner," | : | |
| a/k/a "Jason Thomas," and | : | |
| WILLIAM CHIUSANO, JR., a/k/a "Joe" | : | |

# I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting in Camden, charges:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud – 18 U.S.C. §§ 1349 and 2326)

### Relevant Individuals and Entities

1.      At all times relevant to this Indictment:

        a.      Defendant WILLIAM O'HANLON, a/k/a "Patrick Burns," a/k/a "William Burns," resided in New Jersey and Florida. Defendant WILLIAM O'HANLON operated and controlled WILLIAMS ANDREWS BURNS LLC, a New Jersey company, RESORT BNB, INC., a Florida company, and WILLIAMS & BURNS, INC., a Florida company, and other entities (collectively referred to as "WAB").  WAB operated in and maintained its primary offices in New Jersey, and, at various times, also operated in and maintained offices in California, New York, Arizona, and Florida.

1

b.      Defendant KAREN STEFANOWSKI, a/k/a "Karen O'Hanlon," resided in New Jersey and Florida. Defendant KAREN STEFANOWSKI was employed by WAB as the controller/bookkeeper.

c.      Defendant JAMES TONER, a/k/a "Jason Turner," a/k/a "James Turner," a/k/a "Jason Thomas," resided in New Jersey. Defendant JAMES TONER was employed by WAB as a salesperson and supervisor.

d.      Defendant WILLIAM CHIUSANO, JR., a/k/a "Joe," resided in California. Defendant WILLIAM CHIUSANO, JR. was employed by WAB as a salesperson and the supervisor of WAB's California office during the period from in or about April 2017 through in or about May 2019.

e.      Alex Klemash, a/k/a "Alex Gaskarth," who is named as a co-conspirator charged elsewhere, resided in New Jersey. Alex Klemash was employed by WAB as a salesperson and supervisor during the period from in or about October 2017 through in or about January 2020.

f.      Michael Lambe, a/k/a "Michael Carter," a/k/a "Michael Smith," a/k/a "Mike Murphy," who is named as a co-conspirator charged elsewhere, resided in New Jersey. Michael Lambe was employed by WAB as a salesperson and supervisor during the period from in or about December 2018 through in or about January 2020.

g.      La'Tresa Jackson, a/k/a "Cathy Price," who is named as a co-conspirator charged elsewhere, resided in New Jersey. La'Tresa Jackson was employed at WAB as a salesperson during the period from in or about June 2017 through in or about August 2020.

h.      WAB maintained the following bank accounts at the following banks, in the names of the following corporate entities during the periods indicated below, each of which had

the following authorized signatories:

| Bank | Account Title/Time Period | Last Four Digits of Account No. | Authorized Signatory(ies) |
|---|---|---|---|
| Bank 1 | Williams Andrews Burns LLC (October 2016 – April 2018) | 1115 | WILLIAM O'HANLON and his relative |
| Bank 1 | Williams Andrews Burns LLC (February 2017 – June 2018) | 4771 | WILLIAM O'HANLON and his relative |
| Bank 2 | Williams Andrews Burns LLC (June 2017 – May 2018) | 6134 | WILLIAM O'HANLON and his relative |
| Bank 2 | Williams Andrews Burns LLC (October 2016 – April 2018) | 6538 | WILLIAM O'HANLON and his relative |
| Bank 3 | Williams Andrews Burns LLC (May 2018 – June 2018) | 8832 | WILLIAM O'HANLON and his relative |
| Bank 4 | Williams Andrews Burns LLC (April 2018 – July 2018) | 3361 | WILLIAM O'HANLON and his relative |
| Bank 4 | Williams Andrews Burns LLC (May 2018 – July 2018) | 4354 | WILLIAM O'HANLON |
| Bank 5 | Williams Andrews Burns LLC (June 2018 – February 2020) | 2043 | WILLIAM O'HANLON and his relative |
| Bank 5 | Resort BNB Inc. (November 2019 – June 2020) | 4401 | WILLIAM O'HANLON |
| Bank 5 | Williams & Burns, Inc. (December 2018 – June 2020) | 1204 | WILLIAM O'HANLON |
| Bank 6 | Resort BNB Inc. (December 2019 – January 2020) | 8056 | WILLIAM O'HANLON |
| Bank 6 | Williams Andrews Burns LLC (June 2018 – January 2020) | 4568 | WILLIAM O'HANLON |
| Bank 7 | Williams Andrews Burns LLC (January 2020 – April 2020) | 9469 | WILLIAM O'HANLON |
| Bank 8 | Resort BNB Inc. (January 2020 – December 2020) | 1185 | WILLIAM O'HANLON |
| Bank 8 | Williams & Burns Inc. (January 2020 – November 2021) | 1158 | WILLIAM O'HANLON |
| Bank 9 | Williams & Burns Inc. (February 2020 – December 2020) | 6503 | WILLIAM O'HANLON |
| Bank 9 | Resort BNB Inc. Operating Account (February 2020 – October 2020) | 6538 | WILLIAM O'HANLON |
| Bank 9 | Williams Andrews Burns LLC Operating Account (February 2020 – January 2021) | 6554 | WILLIAM O'HANLON |

i.     The above listed banks were "financial institutions" within the meaning of Title 18, United States Code, Section 20.

### The Conspiracy

2.     From in or about October 2016 through in or about October 2020, in Gloucester and Camden Counties, in the District of New Jersey and elsewhere, the defendants,

WILLIAM O'HANLON, a/k/a "Patrick Burns," a/k/a "William Burns,"
KAREN STEFANOWSKI, a/k/a "Karen O'Hanlon,"
JAMES TONER, a/k/a "Jason Turner," a/k/a "James Turner," a/k/a "Jason Thomas," and
WILLIAM CHIUSANO, JR., a/k/a "Joe,"

did knowingly and intentionally conspire and agree with each other, Alex Klemash, Michael Lambe, La'Tresa Jackson and others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice is set forth below, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

### Object of the Conspiracy

3.     The object of the conspiracy was for defendants WILLIAM O'HANLON, KAREN STEFANOWSKI, JAMES TONER, and WILLIAM CHIUSANO, JR., conspirators Alex Klemash, Michael Lambe, La'Tresa Jackson and their co-conspirators (hereinafter collectively referred to as "the Conspirators"), to financially enrich themselves by selling fraudulent services to timeshare owners offered through WAB under false and fraudulent pretenses, representations and promises, including offering to rent and/or buy timeshare owners' timeshares, and offering to recover monies timeshare owners had previously paid in connection with other scams.

### Manner and Means of the Conspiracy

4.     It was part of the conspiracy that:

a.      Through WAB, defendant WILLIAM O'HANLON operated and controlled tele-marketing calling centers in Gloucester and Camden Counties, New Jersey and elsewhere, which employed KAREN STEFANOWSKI, JAMES TONER, WILLIAM CHIUSANO, JR., Alex Klemash, Michael Lambe, La'Tresa Jackson, and numerous other individuals and co-conspirators.

b.      WAB employed numerous employees who were primarily paid by commission, and generally performed specific roles defined by job title. For example, the sales personnel who called the timeshare owners and sold the services to them were referred to as "Fronters" and "Closers" (collectively referred to herein as the "Sales Conspirators"). Generally, a Fronter would make the initial cold call to a timeshare owner, and once the timeshare owner expressed interest in WAB's offered services, the call would be passed to a Closer (or more than one, if necessary) to complete the sale. The personnel who worked to collect or "recover" monies previously paid by timeshare owners were referred to as "Collectors."

c.      WAB employed supervisors, who were part of their respective sales or collections teams, and who assisted defendant WILLIAM O'HANLON in running the offices and managing WAB's employees. The supervisors were paid additional monies, sometimes in the form of a weekly payment or a percentage of the sales for the week.

d.      Defendant WILLIAM O'HANLON obtained lists of timeshare owners and their contact information, known as "lead sheets," which he provided to the Conspirators. Some of these lead sheets also included additional information about the timeshare owners, including the type of timeshare owned, prior payments made by the timeshare owner to entities known to have engaged in timeshare fraud, and methods of payment. Defendant WILLIAM O'HANLON obtained some of these lead sheets from defendants JAMES TONER and WILLIAM CHIUSANO, JR.

e.      Using these lead sheets, defendant WILLIAM O'HANLON, defendant JAMES TONER, defendant WILLIAM CHIUSANO, JR., La'Tresa Jackson, Alex Klemash, Michael

Lambe, and other conspirators called timeshare owners, many of whom were over 55 years of age, and offered services in return for fees. Those services included renting and/or buying the timeshare owners' timeshares. The Conspirators also offered to recover monies timeshare owners had previously paid in connection with other scams.

      f.      In offering such services and collecting fees from timeshare owners, the Conspirators made numerous false, fraudulent, and misleading statements, representations and promises to the timeshare owners through a variety of sales pitches, some of which were memorialized in written "scripts" provided by defendant WILLIAM O'HANLON to WAB's employees. Defendant JAMES TONER assisted defendant WILLIAM O'HANLON in drafting some scripts. The Conspirators were encouraged to make further false, fraudulent, and misleading statements, representations, and promises, to use whatever sales tactics were necessary to sell WAB's services or a combination of services, and to obtain money from the timeshare owners.

      g.      WAB employed "Collectors" who called new customers and offered "collection services," meaning that the Collectors offered to collect or recover money for timeshare owners who lost money in previous scams. Although defendant WILLIAM O'HANLON was not a collector, he was involved in all aspects of WAB's business, including the collection process and the training of new Collectors.

      h.      In order to disguise their true names, most of WAB's employees used aliases in speaking with the timeshare owners, and some of them used multiple aliases. This was done, in part, to prevent the timeshare owners from relaying the employees' true names in complaints about WAB.

RENTAL SERVICES

      i.      Defendant WILLIAM O'HANLON, defendant JAMES TONER, defendant WILLIAM CHIUSANO, JR., La'Tresa Jackson, Alex Klemash, Michael Lambe, and others were Sales Conspirators who initiated contact with timeshare owners by cold calling them and

6

offering to rent their timeshares for an upfront fee. The rental services offered by the Sales Conspirators were, however, used as a "bait and switch" to obtain customers for WAB's "collections services," and were based upon the following knowingly false and fraudulent pretenses, representations, and promises, among others:

      i.    The timeshare owner had three "bonus" or "getaway" weeks which were not part of their ordinary deeded timeshare time. In actuality, the timeshare owner did not have any such "bonus" or "getaway" timeshare weeks.

      ii.    The "bonus" or "getaway" weeks were going to expire shortly if they were not used. In actuality, this statement was intended to create a false sense of urgency by pressuring the timeshare owner to pay their upfront fees quickly lest they miss out on the promised rental income from the non-existent "bonus" weeks.

      iii.    There was an event (*e.g.*, a flower show, a convention, a concert, or a sporting event) in the area of the timeshare owner's timeshare unit which caused a demand for rentals in that geographical area. In actuality, these events were generally made up by the Sales Conspirators and were part of the high-pressure sales tactics used by the Sales Conspirators.

      iv.    If the timeshare owner was not planning on using these bonus weeks, WAB could rent these weeks out on behalf of the timeshare owner, generally, at a rate of $2,100/week, for a total rental income of $6,300/year. In actuality, WAB did not rent or arrange for the rental of any of the owner's timeshare.

      v.    In return for this rental income, which the Sales Conspirators often promised would be paid to the timeshare owner quickly, the timeshare owner was required to pay an upfront fee, typically, $1,899 for an "annual membership," or $2,899 for a "lifetime membership," which generally entitled the timeshare owner to one year or life (sometimes defined as five years) of rental income, respectively. If the timeshare owner did not have sufficient money to pay the entire fee upfront, the Sales Conspirators often permitted the timeshare owner to pay in installments or agreed to a reduced fee. In actuality, however, WAB

never paid any timeshare owner the promised rental income.

        vi.      WAB offered a money-back guarantee, guaranteeing that the timeshare owners would receive their upfront fee monies back if they did not receive the promised rental monies within a specific period of time, usually 180 days from the owners' payment date. In actuality, most of the timeshare owners who requested a refund from WAB never received any money back.

PAYMENTS/VERIFICATIONS

        j.      When a timeshare owner agreed to purchase WAB's rental services (or other services), the Sales Conspirator collected payment information, which generally included the timeshare owner's contact information, bank account and routing numbers, and wrote them on a "Deal Sheet." The Sales Conspirator typically forwarded the Deal Sheet to defendant KAREN STEFANOWSKI or to a supervisor, that was, defendant WILLIAM O'HANLON, defendant JAMES TONER, Alex Klemash, Michael Lambe, defendant WILLIAM CHIUSANO, JR., and others, who then forwarded the Deal Sheet to defendant KAREN STEFANOWSKI.

        k.      Defendant KAREN STEFANOWSKI used the information on the Deal Sheets to prepare and print checks, drawn on the timeshare owners' bank accounts, which were made out to WAB for the amount of the sale. These checks were generally deposited in person by defendants WILLIAM O'HANLON and/or KAREN STEFANOWSKI into one of WAB's bank accounts, and—if the checks were not stopped or returned— resulted in an electronic transfer of funds. Defendant KAREN STEFANOWSKI knew that the monies obtained through the checks she generated and deposited were the result of false and fraudulent representations made by the Conspirators to the timeshare owners.

        l.      Generally, when a check was received at one of WAB's banks, the bank scanned the check and sent it electronically to a clearing house for processing. A small number of timeshare owners paid by other means, including by mailing checks to WAB's offices in New Jersey, directly depositing monies into a bank account controlled by WAB, bank wire transfers,

8

credit card payments, and money remitting services.

m.     After the Sales Conspirators obtained a timeshare owner's payment information, defendant WILLIAM O'HANLON generally required the Sales Conspirators to obtain verification of the timeshare owner's agreement to the sale. This was accomplished in two ways:

i.     The first way involved a transfer by the Sales Conspirator of the timeshare owner's call to a supervisor with verification authority, including defendant WILLIAM O'HANLON, defendant JAMES TONER, Alex Klemash, or Michael Lambe. In a recorded call, the supervisor spoke to the timeshare owner and verified the timeshare owner's name, address, and payment amount, and obtained verbal consent to withdraw the fee from the owner's bank account. During the call, the supervisors would often add—even if not previously discussed with or agreed to by the timeshare owner—a statement that the fees were paid for both rental and collections services. At the conclusion of the call, the supervisors would typically send the recorded verification electronically to defendants WILLIAM O'HANLON and/or KAREN STEFANOWSKI.

ii.     The second way of verifying the transaction was accomplished by having the timeshare owner electronically sign a confirmation letter authorizing WAB to withdraw funds from the timeshare owner's bank account.

n.     In addition, defendants WILLIAM O'HANLON and KAREN STEFANOWSKI often sent, and caused to be sent, post-sale emails to the timeshare owner which: (i) referenced the timeshare owner's authorization to withdraw funds from their bank account; (ii) included the promise of $2,100 in rentals/week; (iii) included the promise of a money back guarantee; and (iv) referenced the collections services offered by WAB—sometimes mentioned for the first time—which tied the money back guarantee to both rental and collections services. The emails also often attached some of WAB's corporate and business documents.

o.     All of this was done to: (i) assure the timeshare owners that WAB was a legitimate business; (ii) legitimize the self-printed checks as a means of payment, which were sometimes

questioned and/or flagged by the banks; (iii) conflate the collections services with the bogus rental services; and (iv) tie the collections services to the money back guarantee, which the Conspirators later relied upon to justify their failure to provide refunds.

EMPLOYEES WERE PAID PRIMARILY BY COMMISSION

p.      WAB employees tracked the fees paid by the timeshare owners on white boards posted in WAB's offices, typically on a weekly basis.

q.      Defendants WILLIAM O'HANLON and/or KAREN STEFANOWSKI paid and caused paychecks to be issued to the Conspirators on a weekly basis representing the Conspirator's wages and included the Conspirator's share of the proceeds of their sales.

r.      In general, the Closers were paid by commission on a tiered sliding scale—with the percentage of the commission increasing in correspondence to the Closer's sales—as an incentive to sell more. The Fronters and Collectors were paid on an hourly basis and also received commissions and/or payments for sales resulting from calls they made.

s.      Defendant WILLIAM O'HANLON also paid, and caused various supervisors to pay, cash bonuses known as "spifs" to WAB's employees who met specified sales goals.

COLLECTIONS SERVICES

t.      The Conspirators who worked as "Collectors" called new customers and offered "collections services," that is, to collect or recover money for timeshare owners who allegedly lost money in previous scams. These collections services were initially offered as a free service to timeshare owners who had paid for rental services.

u.      Generally, Collectors worked with the timeshare owners to obtain the timeshare owners' credit card records, reviewed the records for any potentially fraudulent charges— particularly from companies known to have committed timeshare fraud—set up conference calls with the timeshare owner and the credit card company's representative, and then disputed various charges with the credit card company. In many instances, the Collectors made and directed the timeshare owners to make false and fraudulent representations to the credit card

10

companies in an effort to obtain refunds for the timeshare owners, including by:

      i.     Falsely stating that the Collector was a friend or relative of the timeshare owner so that the Collector would be permitted by the credit card company to speak on behalf of the timeshare owner; and/or

      ii.     Falsely claiming that a disputed charge had never been authorized by the timeshare owner.

      v.     In addition, the Collectors often made false and fraudulent statements, misrepresentations and promises to the timeshare owners, including by:

      i.     Promising to collect monies on behalf of the timeshare owners which the Collectors knew or should have known could not be collected;

      ii.     Representing that they had obtained for the timeshare owner a credit from a credit card company which the Collector knew or should have known would ultimately be reversed, *e.g.*, if the timeshare owner said that they authorized the fraudulent charge, and forwarding that information to the Sales Conspirators who the Collector knew would then attempt to charge the timeshare owner an additional fee for the phony collections; and

      iii.     Falsely authenticating the false and misleading statements and promises made by the Sales Conspirators during their sales pitches, *e.g.*, by acting as if the promised rental income or collections monies were forthcoming.

      w.     If a Collector was able to obtain a refund of a credit card charge on behalf of a timeshare owner, the credit card company typically credited the timeshare owner's account with a temporary credit. The Collector would then provide notification about the refund to other WAB employees, typically including the Sales Conspirator who originally contacted the timeshare owner. The original Sales Conspirator (or another Sales Conspirator if the original Sales Conspirator was unavailable) would then call the timeshare owner, and ask the timeshare owner to pay another fee for the collections services, typically, 50% or another percentage of the amount "collected." Anytime an additional fee was paid by a timeshare owner, the Conspirators

11

referred to that as a "retread."

x.      When the Sales Conspirator obtained additional fees from the timeshare owners based upon collections, the fees would be logged on a white board in WAB's offices. The Sales Conspirators and Collectors were paid commissions based upon those fees.

y.      When the timeshare owners received a temporary refund on their credit cards, the Sales Conspirators sometimes pitched other schemes to the timeshare owners, claiming that additional monies could be collected in return for upfront fee payments.

z.      In some instances, the credit card refunds remained on the timeshare owners' accounts. In other instances, however, the credit card companies initially refunded the credit charges, only to reinstate them after an investigation. When the credit card companies reinstated the charges on the timeshare owners' credit account, WAB neither provided nor offered a refund of the fee collected. When that occurred, the timeshare owners incurred additional losses.

## GOVERNMENT AGENCY PITCH

aa.     The Conspirators also offered additional fraudulent collections services through what was known as the "Attorney General pitch," the "AG pitch," or the "FTC [Federal Trade Commission] pitch" (collectively referred to herein as the "AG pitch"). In the AG pitch, a Sales Conspirator would call a timeshare owner, most often an existing client, and make the following false and fraudulent statements, misrepresentations or promises:

i.      The Sales Conspirator could see that the timeshare owner was eligible to receive thousands of dollars from a Government entity (often referring to the FTC or a state's Attorney General's Office).

ii.     The money was represented to be proceeds of a lawsuit or other proceeding filed by the Government entity and was payable to the timeshare owner because the owner was a victim of timeshare fraud. When possible, the Sales Conspirator linked the money to a company with which the timeshare owner had previously done business.

iii.    WAB would "release" the money to the timeshare owner in return for the

payment of an upfront fee.

bb.    In actuality, the entire AG pitch was fraudulent. WAB did not have access to any known restitution funds, or make any payments to timeshare owners pursuant to this pitch.

TIMESHARE TAKEOVERS/BUY OUTS

cc.    The Sales Conspirators occasionally offered some timeshare owners an opportunity to sell or transfer their timeshares out of their names in return for a fee. This was appealing to some timeshare owners, mostly elderly owners, based upon their decreased ability to travel, ever-increasing fees charged by the timeshare companies, and/or the timeshare owners' fixed incomes. In all but one known case, the timeshares were not transferred or sold, and the timeshare owners lost their payment to WAB and also continued to incur timeshare fees.

COMPLAINTS/REFUND REQUESTS

dd.    Numerous timeshare owners who had paid fees to WAB complained to the Conspirators that they had not received the promised rental or collections monies, and requested refunds of upfront fees that they paid. Instead of standing behind the promised "money back guarantee," the Conspirators generally did not comply with the requests for refunds, and instead put off the timeshare owners by various tactics, including:

   i.  Asking for more time to comply;

   ii.  Providing false assurances that their monies would be forthcoming;

   iii.  Avoiding their telephone calls;

   iv.  Lying about not receiving their messages;

   v.  Lying about having returned their calls;

   vi.  Attempting to shift responsibility to the "other" WAB group (sales or collections); and

   vii.  Failing to respond to their communications.

ee.    When the timeshare owners were able to reach the Conspirators on the telephone, the Conspirators gave various excuses for their failure to comply with their promises, including

13

the cancellations of events or bad weather in the area of the timeshare owner's timeshare which prevented rentals, and blaming the failure of the timeshare owners to fully cooperate with their collections—including refusing to make false statements and lie to the credit card companies. In most instances, the Conspirators did not refund the timeshare owners' monies.

### Furthering the Conspiracy

5.      In furtherance of the conspiracy and to effect its objects, defendants WILLIAM O'HANLON, KAREN STEFANOWSKI, JAMES TONER, and WILLIAM CHIUSANO, JR., conspirators Alex Klemash, Michael Lambe, La'Tresa Jacskon, and their co-conspirators, both known and unknown, committed, and caused to be committed, the following acts, among others, in the District of New Jersey and elsewhere:

### VICTIM 1

6.      On or about October 7, 2017, La'Tresa Jackson and two Sales Conspirators (hereinafter "Sales Conspirator 8" and "Sales Conspirator 9"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 1, a timeshare owner from Minnesota who was approximately 58 years old at the time. During the call, La'Tresa Jackson, Sales Conspirator 8 and Sales Conspirator 9, using the rentals pitch, sold Victim 1 WAB's phony lifetime rental services for $2,227.

7.      La'Tresa Jackson and/or Sales Conspirator 8 took Victim 1's banking information.

8.      On or about October 7, 2017, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 1's bank account for the amount of $2,227.

9.      Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 1 branch in Clementon, New Jersey. On or about October 10, 2017, the $2,227 was posted to WAB's account at Bank 1 x1115.

10.     Thereafter, Victim 1 repeatedly asked for a refund by telephone and email, and repeatedly denied all collections services offered by WAB.

11.     On or about July 16, 2018, defendant WILLIAM O'HANLON sent and caused to be sent to Victim 1 email communications from an email account used by both defendants WILLIAM O'HANLON and KAREN STEFANOWSKI. Those email communications falsely represented, in substance and in part, that that Victim 1 would receive the promised rental income, and that WAB was actually renting timeshares, stating:

a.     "I will bump you to the top of the list. . . . In addition we had a couple that did a weekend getaway for $500 and I am going to give you credit for that. We'll send a check today."

b.     "You act like you actually have to do something other than cash checks. lol You signed up for the lifetime program so your in this for another 4 years I believe. Have a little patience please."

12.     On or about July 24, 2018, Victim 1 received a $500 refund check drawn on WAB's x2043 account at Bank 5, which defendant WILLIAM O'HANLON falsely represented as "rental income."

13.     Victim 1 continued to attempt to get a full refund, which WAB never provided.

14.     Victim 1 lost approximately $1,727.

<u>VICTIM 2</u>

<u>1st Payment—$949</u>

15.     On or about August 28, 2018, defendant JAMES TONER, La'Tresa Jackson, and a Sales Conspirator (hereinafter "Sales Conspirator 10"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 2, a timeshare owner from Texas who was

approximately 76 years old at the time. During the call, defendant JAMES TONER, La'Tresa Jackson and Sales Conspirator 10, using the rental pitch, sold Victim 2 WAB's phony rental services for $949.

16.     Defendant JAMES TONER and/or La'Tresa Jackson took Victim 2's banking information.

17.     Defendant JAMES TONER conducted the voice verification of payment.

18.     On or about August 28, 2018, defendant KAREN STEFANOWSKI prepared a $949 check drawn on Victim 2's bank account.

19.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Miami, Florida. On or about August 29, 2018, the $949 was posted to WAB's account at Bank 5 x2043.

2nd Payment—$1,731

20.     On or about April 1, 2019, Michael Lambe, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 2 and convinced Victim 2 to pay $1,731 for collections services.

21.     Michael Lambe took Victim 2's banking information.

22.     Defendant JAMES TONER conducted the voice verification of payment.

23.     On or about April 1, 2019, defendant KAREN STEFANOWSKI prepared a $1,731 check drawn on Victim 2's bank account.

24.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Miami Beach, Florida. On or about April 2, 2019, the $1,731 was posted to WAB's account at Bank 5 x2043.

25.     On or about April 3, 2019, defendants WILLIAM O'HANLON and KAREN STEFANOWSKI sent and caused to be sent an email to Victim 2 from an email account they both used, which stated in substance and in part: "If we do not collect or rent in 180 days you are entitled to a full refund. Please reply back to this email that you authorize this transaction." Victim 2 responded via email and authorized the withdrawal of monies.

26.     Victim 2 never received any monies for the promised rentals or collections. Thereafter, Victim 2 repeatedly contacted WAB and asked for a refund, but eventually gave up when the Conspirators stopped responding to Victim 2's telephone calls.

27.     Victim 2 lost approximately $2,680.

## VICTIM 3

28.     On or about October 2, 2018, La'Tresa Jackson, Alex Klemash and a Sales Conspirator (hereinafter "Sales Conspirator 11"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 3, a timeshare owner from Tennessee who was approximately 36 years old at the time. During the call, La'Tresa Jackson, Alex Klemash and Sales Conspirator 11, using the rentals pitch, sold Victim 3 WAB's lifetime phony rental services for $2,399.

29.     La'Tresa Jackson and/or Alex Klemash took Victim 3's banking information.

30.     On or about October 2, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 3's bank account for the amount of $2,399.

31.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Sewell, New Jersey. On or about October 3, 2018, the $2,399 was posted to WAB's account at Bank 5 x2043.

32.     On or about October 3, 2018, defendants WILLIAM O'HANLON and KAREN STEFANOWSKI sent and caused to be sent three emails to Victim 3 from an email account they both used, verifying the transaction, touting the money back guarantee, and forwarding various corporate and business documents.

33.     Thereafter, Victim 3 repeatedly denied all collections services offered by WAB, and repeatedly asked for a refund. Victim 3 never received any monies for the promised rentals or a refund.

34.     Victim 3 lost approximately $2,399.

## VICTIM 4

### 1st Payment—$749

35.     On or about November 12, 2019, Michael Lambe, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 4, a timeshare owner from Virginia who was approximately 86 years old at the time.  During the call, Michael Lambe sold Victim 4 a conflated mixture of WAB's phony timeshare takeover and rental services for $749.

36.     Michael Lambe took Victim 4's banking information.

37.     On or about November 12, 2019, defendant KAREN STEFANOWSKI prepared a $749 check drawn on Victim 4's bank account.

38.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Washington Township, New Jersey. On or about November 13, 2019, the $749 was posted to WAB's account at Bank 5 x2043.

### 2nd Payment—$500

39.     On or about January 30, 2020, defendant WILLIAM O'HANLON contacted Victim 4 and caused Victim 4 to pay $500 for WAB's services.

18

40.     On or about January 30, 2020, defendant WILLIAM O'HANLON caused a wire transfer to be sent from Victim 4's bank account to WAB's bank account at Bank 8 x1185 on that same date.

### 3rd Payment—$2,500

41.     In or about February or March 2020, a Collections Conspirator communicated with Victim 4 multiple times and attempted to reverse multiple charges on Victim 4's credit card totaling approximately $15,395 from a prior fraud upon Victim 4. Victim 4's credit card company gave Victim 4 a temporary credit for approximately $15,395.

42.     On or about March 12, 2020, La'Tresa Jackson, while working in New Jersey, spoke via telephone with Victim 4. During the call, La'Tresa Jackson convinced Victim 4 to pay for WAB's collection services, and took Victim 4's payment information.

43.     On or about March 13, 2020, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 4's bank account for the amount of $2,500.

44.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $2,500 check at a Bank 8 branch in Miami Beach, Florida. On or about March 16, 2020, the $2,500 was posted to WAB's account at Bank 8 x1185.

45.     After the $2,500 was debited from Victim 4's bank account, Victim 4 received an affidavit from his credit card company requiring him to affirm under penalty of perjury that he did not authorize the $15,395 in charges. Because Victim 4 had, in fact, authorized the charges, he refused to sign the false affidavit. As a result, Victim 4's credit card company reinstated the $15,395 in charges. Victim 4 notified WAB about the reinstatement and, instead of refunding the $2,500 fee, defendant WILLIAM O'HANLON berated Victim 4 for failing to lie to the credit card company.

4th Payment—$8,999

46.     On or about September 8, 2020, defendant WILLIAM O'HANLON, using the name "Patrick Burns," spoke via telephone with Victim 4 and convinced Victim 4 to pay an additional $8,999. During that call, defendant WILLIAM O'HANLON took Victim 4's credit card information and caused Victim 4 to be charged $8,999 by two transactions of $4,499.50 on Victim 4's credit card.

47.     At various times, Victim 4 requested a full refund of all the monies that he had paid to WAB, but Victim 4 has not received any of his monies back.

48.     Victim 4 lost approximately $12,748.

VICTIM 5

49.     On or about October 8, 2018, Alex Klemash, Sales Conspirator 10 and another Sales Conspirator (hereinafter "Sales Conspirator 12"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 5, a timeshare owner from California who was approximately 67 years old at the time. During the call, Alex Klemash, Sales Conspirator 10 and Sales Conspirator 12, using the rental pitch, sold Victim 5 WAB's phony rental services for $1,500.

50.     Alex Klemash and/or Sales Conspirator 12 took Victim 5's banking information.

51.     Defendant WILLIAM O'HANLON recorded a voice verification with Victim 5.

52.     On or about October 8, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 5's bank account for the amount of $1,500.

53.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check into WAB's account at Bank 5 x2043 at a location in

Sewell, New Jersey. The $1,500 was posted to WAB's bank account on or about October 9, 2018.

54.      Victim 5 was offered collection services but declined them since he had never been defrauded previously.

55.      Despite repeated requests to WAB, Victim 5 never received any monies for the promised rentals or a refund of his monies.

56.      Victim 5 lost approximately $1,500.

VICTIM 6

1st Payment—$800

57.      On or about March 21, 2019, Alex Klemash and a Sales Conspirator (hereinafter "Sales Conspirator 13"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 6, a timeshare owner from New York who was approximately 82 years old at the time. During the call, Alex Klemash and Sales Conspirator 13, using the rental pitch, sold Victim 6 WAB's phony rental services for $800.

58.      Alex Klemash and/or Sales Conspirator 13 took Victim 6's banking information.

59.      Alex Klemash conducted the voice verification of payment.

60.      On or about March 21, 2019, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 6's bank account for the amount of $800.

61.      On or about March 22, 2019, the check was posted to WAB's account at Bank 5 x2043. However, Victim 6's bank refused to clear the check.

62.      Thereafter, Victim 6 wrote a personal check for $800 and mailed it to WAB.

63.      Defendant WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $800 personal check from Victim 6 into WAB's account at Bank

21

5 x2043 at a branch located in Sewell, New Jersey. The $800 was posted to WAB's account on or about April 12, 2019.

64.     On or about March 25, 2019, Collections Conspirator Sales Conspirator 10 called Victim 6, and Victim 6 notified Sales Conspirator 10 that she did not have any prior fraudulent charges for collections.

2nd Payment—$1,599

65.     On or about May 16, 2019, Alex Klemash and a Sales Conspirator (hereinafter "Sales Conspirator 14"), while working at one of WAB's offices in New Jersey, spoke via telephone to Victim 6 and caused Victim 6 to pay an additional $1,599 for WAB's phony rental services.

66.     Victim 6 wrote a personal check and deposited the check directly into WAB's bank account at Bank 5 x 2043 at a branch located in East Northport, New York. The $1,599 was posted to WAB's bank account on or about May 16, 2019.

67.     Thereafter, Victim 6 repeatedly called WAB to ask for her rental checks, but never received any monies for the promised rentals or a refund.

68.     Victim 6 lost approximately $2,399.

VICTIM 7

69.     On or about March 22, 2019, Alex Klemash and Sales Conspirator 13, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 7, a timeshare owner from South Carolina who was approximately 65 years old at the time. During the call, Alex Klemash and Sales Conspirator 13, using the rental pitch, sold Victim 7 WAB's phony rental services for $2,399.

70.     Alex Klemash and/or Sales Conspirator 13 took Victim 7's banking information.

71.     Alex Klemash conducted the voice verification of payment.

72.     On or about March 22, 2019, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 7's bank account for $2,399.

73.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check into WAB's account at Bank 5 x2043 a branch located in Sewell, New Jersey. The $2,399 was posted to WAB's account on or about March 25, 2019.

74.     Victim 7 never received a refund or any monies for the promised rentals.

75.     Victim 7 lost approximately $2,399.

VICTIM 8

76.     On or about September 12, 2019, Michael Lambe and a Sales Conspirator (hereinafter "Sales Conspirator 15"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 8, a timeshare owner from New York who was approximately 67 years old at the time. During the call, Michael Lambe and Sales Conspirator 15, using the rentals pitch, sold Victim 8 WAB's phony lifetime rental services for $2,449.

77.     Michael Lambe and/or Sales Conspirator 15 took Victim 8's banking information.

78.     On or about September 12, 2019, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 8's bank account for the amount of $2,449.

79.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 location in Sewell, New Jersey. The $2,449 was posted to WAB's account at Bank 5 x2043 on or about September 13, 2019.

80.     Victim 8 never received any monies for the promised rentals.

81.     Victim 8 repeatedly asked for a refund both by phone and email, but eventually gave up when one of the Conspirators falsely told Victim 8 that WAB was dissolved as of March 2020 due to the COVID-19 pandemic.

82.     Victim 8 lost approximately $2,449.

VICTIM 9

83.     On or about June 9, 2018, defendant JAMES TONER and another Sales Conspirator (hereinafter "Sales Conspirator 16"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 9, a timeshare owner from Indiana who was approximately 64 years old at the time. During the call, defendant JAMES TONER and Sales Conspirator 16, using the rentals pitch, sold Victim 9 WAB's phony rental services for $1,899.

84.     Defendant JAMES TONER and Sales Conspirator 16 took Victim 9's banking information.

85.     Defendant WILLIAM O'HANLON conducted the voice verification of payment. During the recorded call with Victim 9, WILLIAM O'HANLON verified Victim 9's permission for WAB to withdraw $1,899 from Victim 9's bank account for the "lifetime" program, specifying that it included the rental of her bonus timeshare weeks as well as a money back guarantee.

86.     On or about June 12, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 9's bank account for the amount of $1,899.

87.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 location in Sewell, New Jersey. On or about June 13, 2018, the $1,899 was posted to WAB's account at Bank 5 x2043.

24

88.     On or about June 13, 2018, Victim 9 received an email signed by defendant WILLIAM O'HANLON from an email account used by both WILLIAM O'HANLON and defendant KAREN STEFANOWSKI, which stated "We guarantee in 180 days to rent your timeshare rental weeks or collect fraudulent charges you have paid or you are entitled to a full refund." The next day, Victim 9 replied "ok" to the email.

89.     Victim 9 never received any monies for the promised rentals. Victim 9 repeatedly asked for a refund, and even complained to the Better Business Bureau. Victim 9 never received a refund.

90.     Victim 9 lost approximately $1,899.

VICTIM 10

1st Payment – $950

91.     On or about July 9, 2018, Sales Conspirator 12 and another Sales Conspirator (hereinafter "Sales Conspirator 17"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 10, a timeshare owner from Indiana who was approximately 86 years old at the time. During the call, Sales Conspirator 12 and Sales Conspirator 17, using the rentals pitch, sold Victim 10 WAB's phony lifetime rental services for $950.

92.     Sales Conspirator 12 and/or Sales Conspirator 17 took Victim 10's banking information.

93.     On or about July 9, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 10's bank account for the amount of $950.

94.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $950 check at a Bank 5 location in Sewell, New Jersey. On or about July 10, 2018, the $950 was posted to WAB's account at Bank 5 x2043.

### 2nd Payment – $1,400

95.     On or about September 19, 2018, Sales Conspirator 14 called Victim 10 and sold him other WAB services for $2,842.

96.     Sales Conspirator 14 took Victim 10's banking information.

97.     Defendant WILLIAM O'HANLON conducted the voice verification of payment. During a recorded call with Victim 10 on or about September 19, 2018, defendant WILLIAM O'HANLON verified Victim 10's permission for WAB to withdraw $2,842 from Victim 10's bank account for "the collections on your timeshare resale fraud." Victim 10 affirmed his permission, then admitted, after defendant WILLIAM O'HANLON falsely told him that he had stopped the recording, that Victim 10 did not have enough money in his bank account to pay for the services. Defendant WILLIAM O'HANLON offered for Victim 10 to pay $1,400 now and the remaining $1,400 later.

98.     On or about September 19, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 10's bank account for the amount of $1,400.

99.     Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $1,400 check at a Bank 5 location in Sewell, New Jersey. On or about September 20, 2018, the $1,400 was posted to WAB's account at Bank 5 x2043.

### 3rd Payment – $1,400

100.    On or about September 26, 2018, Sales Conspirator 14 and a Sales Conspirator (hereinafter "Sales Conspirator 18"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 10, and convinced Victim 10 to pay the remaining $1,400 from the September 19, 2018 sale.

101.    Sales Conspirator 14 and/or Sales Conspirator 18 took Victim 10's banking information.

102.    On or about September 26, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 10's bank account for the amount of $1,400.

103.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $1,400 check at a Bank 5 location in Sewell, New Jersey. On or about September 27, 2018, the $1,400 was posted to WAB's account at Bank 5 x2043.

104.    Thereafter, Victim 10 called and left numerous voicemail messages on various WAB employees' phones, requesting the promised monies. On or about February 20, 2019, Victim 10 received a $500 refund from WAB. Victim 10 continue to call and ask for the promised money. On or about April 15, 2019, Victim 10 was sent another $500 refund from WAB.

105.    Victim 10 lost approximately $2,750.

## VICTIM 11

106.    On or about February 25, 2019, Sales Conspirators from WAB's Arizona office spoke via telephone with Victim 11, a timeshare owner from New Jersey who was approximately 68 years old at the time. During the call, the Sales Conspirators, using the rental pitch, sold Victim 11 WAB's phony rental services for $1,899, and took Victim 7's banking information.

107.    Alex Klemash conducted the voice verification of payment.

108.    On or about February 25, 2019, defendant KAREN STEFANOWSKI prepared a check drawn Victim 11's bank account for $1,899.

109.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $1,899 check into WAB's account at a Bank 5 branch located in

27

Sewell, New Jersey. On or about February 26, 2019, the $1,899 was posted to WAB's account at Bank 5 x2043.

110.    Victim 11 never received any monies for the promised rentals. Victim 11 asked for a refund, but never received one.

111.    Victim 11 lost approximately $1,899.

VICTIM 12

112.    On or about August 7, 2019, two Sales Conspirators (hereinafter "Sales Conspirator 19" and "Sales Conspirator 20"), while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 12, a timeshare owner from California who was approximately 40 years old at the time, and in Las Vegas, Nevada at the time of the call. During the call, Sales Conspirator 19 and Sales Conspirator 20, using the rental pitch, sold Victim 12 WAB's phony rental services for $2,399.

113.    Sales Conspirator 19 and/or Sales Conspirator 20 took Victim 12's banking information.

114.    On or about August 7, 2019, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 12's bank account for $2,399.

115.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $2,399 check into WAB's account at a Bank 5 branch located in Sewell, New Jersey. On or about August 8, 2019, the $2,399 was posted to WAB's account at Bank 5 x2043.

116.    On or about August 7, 2019, Victim 12 received an email signed by "Karen O'Hanlon" from an email account used by defendants WILLIAM O'HANLON and KAREN STEPHANOWSKI which contained a link for Victim 12 to electronically verify his permission

to take the money from his bank account. The email included the money back guarantee, "If we do not collect or rent in 180 days you are entitled to a full refund by requesting in writing." On or about August 8, 2019, Victim 12 electronically signed and returned the email.

117.   Victim 12 never received any monies for the promised rentals. Despite repeated requests to WAB for a refund—including a written request sent to the email account used by defendants WILLIAM O'HANLON and KAREN STEFANOWSKI on or about October 15, 2019, Victim 12 never received a refund.

118.   Victim 12 lost approximately $2,399.

VICTIM 13

119.   On or about October 1, 2019, defendant JAMES TONER, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 13, a timeshare owner from Pennsylvania who was approximately 68 years old at the time. During the call, defendant JAMES TONER, using the rentals pitch, sold Victim 13 WAB's phony lifetime rental services for $2,899.

120.   Defendant JAMES TONER took Victim 13's banking information.

121.   On or about October 1, 2019, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 13's bank account for the amount of $2,899.

122.   Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the $2,899 check into WAB's account at a Bank 5 branch located in Sewell, New Jersey. On or about October 2, 2019, the $2,899 was posted to WAB's account at Bank 5 x2043.

123.    Thereafter, Victim 13 called WAB to check on her money, and was told she would receive a call back. Victim 13 never received a return call from WAB's employees, nor did she receive any rental monies, or a refund.

124.    Victim 13 lost approximately $2,899.

### VICTIM 14

### 1st Payment – $980

125.    On or about August 20, 2018, defendant WILLIAM CHIUSANO, JR. and/or a Sales Conspirator (hereinafter "Sales Conspirator 21"), working at WAB's California office, spoke via telephone with Victim 14, a timeshare owner from Illinois who was approximately 63 years old at the time. During the call, defendant WILLIAM CHIUSANO, JR. and/or Sales Conspirator 21 sold Victim 14 WAB's services for $980.

126.    Defendant WILLIAM CHIUSANO, JR. and/or Sales Conspirator 21 took Victim 14's banking information, wrote it on a Deal Sheet, and forwarded the Deal Sheet from defendant WILLIAM CHIUSANO, JR.'s email to an email address used by defendants WILLIAM O'HANLON and/or KAREN STEFANOWSKI.

127.    On or about August 20, 2018, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 14's bank account for the amount of $980.

128.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Sewell, New Jersey. On or about August 21, 2018, the $980 was posted to WAB's Bank 5 Account x2043.

2nd Payment – $1,785

129.    On or about February 18, 2019, defendant WILLIAM CHIUSANO, JR. and/or

Sales Conspirator 21, working at WAB's California office, spoke via telephone with Victim 14

and sold Victim 14 WAB's phony rental services and collection services for $1,785.

130.    Defendant WILLIAM CHIUSANO, JR. and/or Sales Conspirator 21 took Victim

14's banking information, wrote it on a Deal Sheet, and forwarded the Deal Sheet from defendant

WILLIAM CHIUSANO, JR.'s email to an email used by defendants WILLIAM O'HANLON

and KAREN STEFANOWSKI.

131.    On or about February 18, 2019, defendant KAREN STEFANOWSKI prepared a

check drawn on Victim 14's bank account for the amount of $1,785.

132.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited,

and caused to be deposited, the check at a Bank 5 branch in Sewell, New Jersey. On or about

February 19, 2019, the $1,785 was posted to WAB's account at Bank 5 x2043.

133.    Victim 14 never received any rentals, collections, or refunds money from either

of these transactions.

134.    Victim 14 lost approximately $2,765.

VICTIM 15

1st Payment – $725

135.    On or about April 24, 2019, defendant WILLIAM CHIUSANO, JR. and/or Sales

Conspirator 21, working at WAB's California office, spoke via telephone with Victim 15, a

timeshare owner from Maryland who was approximately 72 years old at the time. During the

call, defendant WILLIAM CHIUSANO, JR. and/or Sales Conspirator 21, sold Victim 15 WAB's

collections services for $1,450.

136.    Defendant WILLIAM CHIUSANO, JR. and/or Sales Conspirator 21 took Victim 15's banking information, wrote it on a Deal Sheet, and forwarded the Deal Sheet from defendant WILLIAM CHIUSANO, JR.'s email to an email address used by defendants WILLIAM O'HANLON and/or KAREN STEFANOWSKI.

137.    On or about April 25, 2019, defendant KAREN STEFANOWSKI prepared a check drawn on Victim 15's bank account for the amount of $725.

138.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Sewell, New Jersey. On or about April 25, 2018, the $725 was posted to WAB's Bank 5 Account x2043.

### 2nd Payment – $725

139.    On or about April 30, 2019, Defendant WILLIAM CHIUSANO, JR. sent an email to an email account used by defendants WILLIAM O'HANLON and KAREN STEFANOWSKI having the subject line, "[Name of Victim 15] 725 payment owed" and the following message in the body of the email: "On original paperwork Bank on file Check 1232."

140.    Defendant KAREN STEFANOWSKI prepared a check on or about April 30, 2019 drawn on Victim 15's bank account for the amount of $725.

141.    Defendants WILLIAM O'HANLON and KAREN STEFANOWSKI deposited, and caused to be deposited, the check at a Bank 5 branch in Sewell, New Jersey. On or about May 1, 2019, the $725 was posted to WAB's Bank 5 Account x2043.

142.    Victim 15 never received any monies from WAB or as a result of WAB's collections efforts. Victim 15 asked for a refund but did not receive one.

143.    Victim 15 lost approximately $1,450.

## THE FRAUDULENT SCHEME WAS COMMITTED THROUGH THE USE OF WIRES

144.    As described above, in the District of New Jersey and elsewhere, defendants WILLIAM O'HANLON, KAREN STEFANOWSKI, JAMES TONER, WILLIAM CHIUSANO, conspirators Alex Klemash, Michael Lambe, La'Tresa Jacskon, and their co-conspirators did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce and foreign commerce—including via telephone calls, emails, text messages, and the electronic transfer of monies—certain writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme. Their scheme has resulted in more than $2 million in losses to more than 800 victims.

In violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, and the offense victimized ten or more persons over the age of 55, or targeted persons over the age of 55, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326.

## COUNTS TWO THROUGH NINE

(Wire Fraud – 18 U.S.C. §§ 1343, 2326 and 2)

1.      Paragraphs 1 and 3 through 144 of Count 1 of the Indictment are incorporated as if set forth in full herein.

2.      On or about the dates set forth below, in the District of New Jersey, and elsewhere, defendants

WILLIAM O'HANLON, a/k/a "Patrick Burns," a/k/a "William Burns,"
KAREN STEFANOWSKI, a/k/a "Karen O'Hanlon,"
JAMES TONER, a/k/a "Jason Turner," a/k/a a/k/a "James Turner, a/k/a "Jason Thomas," and
WILLIAM CHIUSANO, JR., a/k/a "Joe,"

knowingly devised and intended to devise a scheme and artifice to defraud victims of money and property by means of materially false and fraudulent pretenses, representations, and promises, and aided and abetted the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, for the purposes of executing and attempting to execute this scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire, radio and television communications in interstate commerce, certain writings, signs, signals, pictures and sounds, each transmission constituting a separate count:

| COUNT | DATE | VICTIM | DESCRIPTION | DEFENDANTS |
|-------|------|--------|-------------|------------|
| 2 | 6.9.2018 | Victim 9 | James Toner and William O'Hanlon in New Jersey spoke to Victim 9 in Indiana via telephone and sold her phony rental services. | William O'Hanlon James Toner |
| 3 | 6.13.2018 | Victim 9 | Karen Stefanowski drafted a $1,899 check drawn on Victim 9's bank account, which was deposited into WAB's account x2043 at Bank 5 in Sewell, New Jersey, and was electronically processed via servers outside of New Jersey. | William O'Hanlon James Toner Karen Stefanowski |

| COUNT | DATE | VICTIM | DESCRIPTION | DEFENDANTS |
|---|---|---|---|---|
| 4 | 9.30.2019 | Victim 13 | James Toner in New Jersey called Victim 13 in Pennsylvania and sold her phony rentals services. | William O'Hanlon James Toner |
| 5 | 10.2.2019 | Victim 13 | Karen Stefanowski drafted a $2,899 check drawn on Victim 13's bank account, which was deposited into WAB's account x2043 at Bank 5 in Sewell, New Jersey, and was electronically processed via servers outside of New Jersey. | William O'Hanlon James Toner Karen Stefanowski |
| 6 | 8.21.2018 | Victim 14 | Karen Stefanowski drafted a $980 check drawn on Victim 14's bank account, which was deposited into WAB's account x2043 at Bank 5 in Sewell, New Jersey, and was electronically processed via servers outside of New Jersey. | William O'Hanlon William Chiusano, Jr. Karen Stefanowski |
| 7 | 2.19.2019 | Victim 14 | Karen Stefanowski drafted a $1,785 check drawn on Victim 14's bank account, which was deposited into WAB's account x2043 at Bank 5 in Sewell, New Jersey, and was electronically processed via servers outside of New Jersey. | William O'Hanlon William Chiusano, Jr. Karen Stefanowski |
| 8 | 4.25.2019 | Victim 15 | Karen Stefanowski drafted a $725 check drawn on Victim 15's bank account, which was deposited into WAB's account x2043 at Bank 5 in Sewell, New Jersey, and was electronically processed via servers outside of New Jersey. | William O'Hanlon William Chiusano, Jr. Karen Stefanowski |
| 9 | 5.1.2019 | Victim 15 | Karen Stefanowski drafted a $725 check drawn on Victim 15's bank account, which was deposited into WAB's account x2043 at Bank 5 in Sewell, New Jersey, and was electronically processed via servers outside of New Jersey. | William O'Hanlon William Chiusano, Jr. Karen Stefanowski |

In violation of Title 18, United States Code, Sections 1343 and 2.

The offense occurred in connection with the conduct of telemarketing, and the offense victimized ten or more persons over the age of 55, or targeted persons over the age of 55, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326.

## COUNTS 10 THROUGH 12
(Tax Evasion – 26 U.S.C. § 7201)

1.     Paragraphs 1 and 3 through 114 of Count 1 of this Indictment are incorporated as if set forth in full herein.

2.     From at least as early as 2017 and continuing through in or around October 2020, defendant WILLIAM O'HANLON, was a resident of Gloucester County, New Jersey, and was engaged in the fraudulent scheme described in Counts 1 through 9 above, from his office, home and elsewhere in New Jersey.

3.     At all times relevant to these counts of the Indictment:

     a.     The Internal Revenue Service ("IRS") was a constituent agency of the United States Department of Treasury and part of the Executive Branch of the Government responsible for administering and enforcing the tax laws of the United States and collecting taxes owed to the Treasury of the United States and providing refunds of taxes overpaid.

     b.     Generally, individuals were required by law to prepare and file income tax returns with the IRS by April 15 of the year following the year when the income was earned unless an extension was granted. That deadline could sometimes change if April 15 falls on a weekend. Additionally, the deadline for filing tax returns for tax year 2019 was changed to July 15, 2020, due to the COVID-19 pandemic.

     c.     If an individual's income tax returns showed that income taxes were due and owing, then the taxpayer was obligated by law to pay that sum of money to the IRS.

     d.     A Limited Liability Company (LLC) is an entity created by state statute. Depending on elections made by the LLC and the number of members, the IRS will treat an LLC either as a corporation, a partnership, or as part of the owner's tax return (a "disregarded entity").

For income tax purposes, an LLC with only one member is treated as an entity disregarded as separate from its owner, unless it affirmatively elects to be treated as a corporation.

      e.    If the single-member LLC does not elect to be treated as a corporation, the LLC is a "disregarded entity" and the LLC's activities should be reflected on its owner's federal income tax return. If the owner is an individual, the activities of the LLC will generally be reflected on Form 1040, Schedule C, Profit or Loss from Business (Sole Proprietorship).

      4.    In or about November 2015, a certificate of formation was filed with the State of New Jersey for WILLIAMS ANDREWS BURNS LLC. Defendant WILLIAM O'HANLON and his relative were listed as the authorized representatives, defendant WILLIAM O'HANLON was listed as the President, and his relative was listed as the registered agent.

      5.    Subsequently, defendant WILLIAM O'HANLON filed for an IRS tax identification number ("EIN") for WILLIAMS ANDREWS BURNS LLC. On the application, defendant WILLIAM O'HANLON listed himself as the sole member of WILLIAMS ANDREWS BURNS LLC. Defendant WILLIAM O'HANLON did not affirmatively elect to have WILLIAMS ANDREWS BURNS LLC treated as a corporation with the IRS; therefore, the activities of WILLIAMS ANDREWS BURNS LLC were required to be reported on defendant WILLIAM O'HANLON's personal tax return on Form 1040, Schedule C.

      6.    In response to the application, in or about September 2016, the IRS issued an EIN ending in x0218 to WILLIAMS ANDREWS BURNS LLC.

      7.    Defendant WILLIAM O'HANLON used WILLIAMS ANDREWS BURNS LLC to carry out the fraudulent scheme alleged above and also established other entities for the purpose of carrying out the fraudulent scheme.

8.     During tax years 2017, 2018, and 2019, defendant WILLIAM O'HANLON received substantial income from WILLIAMS ANDREWS BURNS LLC and other entities. Defendant WILLIAM O'HANLON was obligated to report such income on an individual Form 1040, Schedule C.

9.     During tax years 2017, 2018, and 2019, defendant WILLIAM O'HANLON had substantial tax liability from the income that he received from WILLIAMS ANDREWS BURNS LLC.

10.     Defendant WILLIAM O'HANLON knew that he was responsible for filing income tax returns.

11.     During tax years 2017, 2018 and 2019, defendant WILLIAM O'HANLON engaged in numerous affirmative acts to conceal and attempt to conceal the income that he received from WILLIAMS ANDREWS BURNS LLC, in order to evade the assessment of a tax, including, among other things: (a) using his relative's name to establish entities and bank accounts in order to conceal the true ownership of the businesses; (b) maintaining, using and controlling bank accounts at multiple different banks; (c) withdrawing monies in cash from the various bank accounts that he controlled and used, and using such cash to pay both business and personal expenses; (d) at times, structuring those cash withdrawals in amounts below $10,000 in order to avoid reporting requirements; and (e) failing to report to the IRS the payments made to employees or independent contractors of the businesses, while preparing fictitious payroll and tax reporting documents for certain employees to conceal that income to them was not reported to the IRS.

12.     On or about April 17, 2018, defendant WILLIAM O'HANLON failed to file a 2017 tax return on behalf of himself and failed to seek an extension to file such a return, despite

the fact that he had substantial taxable income during 2017 and had substantial taxes due and owing on that income.

13. On or about April 15, 2019, defendant WILLIAM O'HANLON failed to file a 2018 tax return on behalf of himself and failed to seek an extension to file such a return, despite the fact that he had substantial taxable income during 2018 and had substantial taxes due and owing on that income.

14. On or about July 15, 2020, defendant O'HANLON failed to file a 2019 tax return on behalf of himself and failed to seek an extension to file such a return, despite the fact that he had substantial taxable income during 2019 and had substantial taxes due and owing on that income..

15. From in or about January 2017 through on or about July 15, 2020, in the District of New Jersey, and elsewhere, the defendant,

WILLIAM O'HANLON, a/k/a "Patrick Burns," a/k/a "William Burns,"

knowing that he had received taxable income upon which there was income tax due and owing to the United States of America, and failing to make an income tax return on or before the dates set forth below, as required by law, to any proper officer of the Internal Revenue Service, and to pay income tax to the Internal Revenue Service, did willfully attempt to evade and defeat substantial income tax due and owing by him to the United States of America for the tax years set forth below, by committing the affirmative acts of tax evasion set forth in paragraph 11 above, among others, with each tax year constituting a separate count of this Indictment:

| Count | Tax Year | Tax Return Due Date |
|-------|----------|---------------------|
| 10 | 2017 | April 17, 2018 |
| 11 | 2018 | April 15, 2019 |
| 12 | 2019 | July 15, 2020 |

In violation of Title 26, United States Code, Section 7201.

**COUNT 13**
(Theft of Government Funds – Social Security and Medicaid Benefits – 18 U.S.C. § 641)

1.      Paragraphs 1 and 3 through 114 of Count 1 and paragraphs 2 through 14 of Counts 10 through 12 of this Indictment are incorporated as if set forth in full herein.

2.      At all times relevant to this Count of the Indictment:

a.      The United States Social Security Administration ("SSA") was an agency of the executive branch of the United States. The SSA, among other things, maintained the Supplemental Security Income ("SSI") program under Title XVI of the Social Security Act, Title 42, United States Code, Section 401 *et seq.*, for eligible individuals. The object of the SSI program was to provide monthly financial assistance to people who had limited income and resources, and people who were 65 years of age or older, were blind, or disabled.

b.      Generally, to be eligible for the Title XVI SSI program, an individual must have met the definition of disability, meaning that they were unable to perform past relevant work and could not perform any other type of work because of a physical or mental impairment which had lasted, or was expected to last, for at least 12 months, or which could be expected to result in death.

c.      Since SSI was a needs-based program, an individual had to have limited income and resources to qualify if the individual also met the disability requirements.  All income from all sources, including parents' or a spouse's, were considered and could affect the amount of SSI benefits paid to an eligible person.

d.      For instance, if the value of an individual's countable resources exceeded $2,000 for an individual or $3,000 for a married couple, then the individual was ineligible to receive SSI for that month.

e.      An individual applying for or receiving SSI was obligated to tell the SSA if they ever received any income, if they started or stopped work, if they got married, or if they gave any money away, among other things, and the SSA so informed the applicant or recipient.

f.      Even though the SSA managed the SSI program, Social Security Taxes did not fund SSI, but rather it was funded by the United States Treasury's general fund.

g.      Medicaid was a state-run health insurance program.  It was partially funded by the Federal Government.  It helped many people who could not afford medical care pay for some or all of their medical bills.  Medicaid was available to people and families who had limited income and resources.  People who were blind or disabled, age 65 or older, children, or members of families with dependent children may have been eligible.  Medicaid also could help pay Medicare premiums, deductibles, and coinsurance for some individuals.  Each state decided who was eligible and the amount of medical care and services it would cover.

h.      In the State of New Jersey, if an individual was eligible for SSI, that individual automatically received medical assistance in the form of Medicaid.

### The Charge

3.      From in or about August 2016 to in or about November 2021, in Gloucester County, in the District of New Jersey and elsewhere, the defendant,

WILLIAM O'HANLON, a/k/a "Patrick Burns," a/k/a "William Burns,"

did knowingly and intentionally embezzle, steal, purloin, and convert to his own use and the use of another, money of the United States and the SSA in excess of $1,000, that is, Title XVI Supplemental Security Income payments from the Social Security Administration and Medicaid benefits, to which he was not entitled.

The Scheme

4.       In or around August 2016, defendant WILLIAM O'HANLON applied for SSI falsely claiming that he was disabled and could not work. As part of his application, which was attested under penalty of perjury, defendant WILLIAM O'HANLON made several knowingly false representations, including but not limited to: that his sole asset was a vehicle valued at $2,000; that his sole monthly income was approximately $140; and that he did not have a bank account. As part of the application, defendant WILLIAM O'HANLON agreed to notify the SSA if there was any improvement in his medical condition or if he regained the ability to work.

5.       In or around February 2017, defendant WILLIAM O'HANLON falsely reaffirmed to the SSA, under penalty of perjury, that, among other things, he was disabled and could not work, his sole asset was a vehicle valued at $2,000, his sole monthly income was approximately $140, and that he did not have a bank account.

6.       In or around March 2017, in reliance on defendant WILLIAM O'HANLON's false statements, the SSA found defendant WILLIAM O'HANLON eligible for SSI benefits of approximately $766.25 per month. The SSA started making payment to him retroactive to August 2016, and the payments increased over time pursuant to cost of living increases, and continued through on or about November 1, 2021.

7.       Relying on information provided by defendant WILLIAM O'HANLON, the SSA found that defendant WILLIAM O'HANLON could not manage his own finances, so it appointed defendant WILLIAM O'HANLON's relative as the representative payee, who would receive defendant WILLIAM O'HANLON's payments on behalf of, and for the benefit of, defendant WILLIAM O'HANLON. The SSA began making payments to defendant WILLIAM O'HANLON's relative for the benefit of defendant WILLIAM O'HANLON.

8.      Based upon the SSA's determination that defendant WILLIAM O'HANLON was eligible for SSI benefits, he was also enrolled in Medicaid and began accepting medical assistance from Medicaid.

9.      From in or around February 2017, March 2017, March 2019, and August 2019, the SSA repeatedly advised defendant WILLIAM O'HANLON that he was obligated to notify the SSA if any of several events occurred, including but not limited to: he started or stopped work or if his wages increased or decreased; his bank account balance went over $2,000; he got married; he moved; income or resources changed for him or members of his household; or his medical condition improved.

10.     Defendant WILLIAM O'HANLON never notified the SSA that, among other things, he was operating WAB, he was receiving significant income from WAB, and he was a signatory on bank accounts with a value of more than $2,000.

11.     The total amount of SSI benefits that defendant WILLIAM O'HANLON collected to which he was not entitled was approximately $50,000. The total amount of Medicaid benefits that defendant WILLIAM O'HANLON collected to which he was not entitled was in excess of $100,000.

In violation of Title 18, United States Code, Section 641.

## **FORFEITURE ALLEGATION AS TO COUNTS 1 THROUGH 9 AND 13**

### **Count 1**

1.      Upon conviction of the offense in violation of 18 U.S.C. § 1349 charged in Count 1of this Indictment, defendants WILLIAM O'HANLON, KAREN STEFANOWSKI, JAMES TONER, and WILLIAM CHIUSANO, JR. shall forfeit to the United States all property, real and personal—

        a.      used or intended to be used to commit, to facilitate, or to promote the commission of such offense, pursuant to 18 U.S.C. § 982(a)(8)(A), including, but not limited to, any equipment, software, or other technology used or intended to be used to commit or to facilitate the commission of such offense, pursuant to 18 U.S.C. § 2328(a)(2); and

        b.      constituting, derived from, or traceable to the gross proceeds the respective defendants obtained directly or indirectly as a result of the offense; and all property traceable to such property, pursuant to 18 U.S.C. §§ 982(a)(8)(B) and 2328(a)(1).

### **Counts 2 through 9**

2.      Upon conviction of one or more of the offenses in violation of 18 U.S.C. § 1343 charged in Counts 2 through 9 of this Indictment, defendants WILLIAM O'HANLON, KAREN STEFANOWSKI, JAMES TONER, and WILLIAM CHIUSANO, JR. shall forfeit to the United States all property, real and personal—

        a.      used or intended to be used to commit, to facilitate, or to promote the commission of such offense, pursuant to 18 U.S.C. § 982(a)(8)(A), including, but not limited to, any equipment, software, or other

technology used or intended to be used to commit or to facilitate the

commission of such offense, pursuant to 18 U.S.C. § 2328(a)(2); and

b.      constituting, derived from, or traceable to the gross proceeds the

respective defendants obtained directly or indirectly as a result of the

offense; and all property traceable to such property, pursuant to 18

U.S.C. §§ 982(a)(8)(B) and 2328(a)(1).

## Count 13

3.      Upon conviction of the violation of 18 U.S.C. § 641 charged in Count 13 of this

Indictment, defendant WILLIAM O'HANLON shall forfeit to the United States, pursuant to 18

U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or

is derived from proceeds the defendant obtained directly or indirectly as a result of such

offense.

## SUBSTITUTE ASSETS PROVISION (APPLICABLE TO ALL FORFEITURE ALLEGATIONS)

4.      If any of the above-described forfeitable property, as a result of any act or omission of

the respective defendant(s):

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third person;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be subdivided
         without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C.

§ 982(b) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

A TRUE BILL:

FOREPERSON

_____
PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 23-_____

**United States District Court**
**District of New Jersey**

## UNITED STATES OF AMERICA

v.

**WILLIAM O'HANLON, a/k/a "Patrick Burns," a/k/a "William Burns,"**
**KAREN STEFANOWSKI, a/k/a "Karen O'Hanlon,"**
**JAMES TONER, a/k/a "Jason Turner," a/k/a "James Turner," "Jason Thomas," and**
**WILLIAM CHIUSANO, JR., a/k/a "Joe"**

### INDICTMENT FOR

**18 U.S.C. §§ 1343, 1349, 2326, 641, and 2**
**26 U.S.C. § 7201**

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

DIANA VONDRA CARRIG
ELISA T. WIYGUL
ASSISTANT U.S. ATTORNEYS
CAMDEN, NEW JERSEY
(856) 757-5026